NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0798n.06

Nos. 12-3132, 13-3212

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| L.F.P.IP, LLC; LFP, INC.; LARRY C. FLYNT, | ) ) ) | **FILED**<br>Aug 28, 2013<br>DEBORAH S. HUNT, Clerk |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| HUSTLER CINCINNATI, INC.; JIMMY R. FLYNT, | ) ) ) | |
| Defendants-Appellants. | ) | |

Before: GIBBONS, SUTTON, and KETHLEDGE, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Larry and Jimmy Flynt[1] are brothers who have been involved with the development of the Hustler enterprise. Larry and his corporate entities brought this lawsuit against his brother and Hustler Cincinnati, Inc. ("HCI"), alleging that Jimmy violated the Lanham Act, 15 U.S.C. § 1051 *et seq.*, by using the "Hustler" trademark in connection with his retail store in Cincinnati. Larry alleged unfair competition, false designation of origin, and false impression of association in violation of the Lanham Act, as well as common law unfair competition and state law claims for breach of contract and deceptive trade practices. Jimmy counterclaimed, asserting that the brothers were partners in the Hustler enterprise and seeking an

---

[1]For clarity, we refer to Larry and Jimmy Flynt by their first names.

-1-

accounting and dissolution of the partnership.  Jimmy also alleged wrongful termination, unjust enrichment, fraud, breach of fiduciary duty, and breach of contract to make a will.

The district court concluded that Jimmy failed to establish the existence of an express or implied partnership between the brothers and that Jimmy infringed Larry's trademark.  It granted summary judgment in Larry's favor on all of Jimmy's counterclaims.  The district court permanently enjoined Jimmy from using the Hustler trademark and any other trademark owned by Larry's corporate entities.  It also required HCI to change its corporate name to remove any reference to Hustler.  In a subsequent order, the district court noted that the analysis applicable to Larry's related federal and state false impression and deceptive trade practices claims "mirrors that for a claim of trademark infringement under the Lanham Act" and dismissed those claims.  Finally, it dismissed without prejudice Jimmy's claim for breach of contract to make a will because it found that the claim had not yet accrued.  This appeal followed.  We affirm the district court's judgment in all respects.

I.

In 1969, Larry and Jimmy opened a nightclub in downtown Cincinnati.  Jimmy fronted $5,000 to open the bar but was repaid within a week.  The nightclub was known as "The Hustler Club."  In the early 1970s, the business expanded to include at least six clubs.  The company applied for trademarks.  Due to concerns about Larry's legal exposure, the corporate structure included several separate entities and was intentionally obscured to make it difficult to determine the true owners of each business.  In 1974, *Hustler* magazine was first published.  In 1975, the magazine purchased and published nude photographs of Jacqueline Kennedy Onassis, which drew increased profits to the magazine.  Following the publication of this issue, Larry sought to consolidate legal

Nos. 12-3132, 13-3212
*L.F.P.IP, LLC, et al. v. Hustler Cincinnati, Inc., et al.*

ownership of all of the businesses in himself. To do this, he formed a parent corporation, L.F.P., Inc., and designated himself as the corporation's sole shareholder.

Around 1983, Larry began exhibiting erratic behavior, announcing his candidacy for President of the United States and levying threats against President Ronald Reagan and federal judges. As a result of this behavior, Larry was sentenced to fifteen months in prison for contempt of court, during which he ran the affairs of Hustler remotely from prison. He attempted to give all of the corporate assets to the American Atheist Group and to "force employees out of the company." In response, Jimmy sought and received a conservatorship over the business, which lasted approximately from March to December 1984.

Larry later sued Jimmy in Los Angeles Superior Court, alleging that Jimmy had misappropriated company funds during the conservatorship. The case ultimately terminated in a settlement and release, releasing all claims known and unknown up to the date of the agreement, November 15, 1988.

II.

The district court granted summary judgment to Larry on his trademark infringement claims. We review a grant of summary judgment *de novo*. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008). In doing so, we view the evidence in the light most favorable to the non-moving party. *Id.* at 390. However, "[n]ot just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a *genuine* issue of *material* fact." *Rhodes v. Pittard*, 485 F. App'x 113, 114 (6th Cir. 2012). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of

Nos. 12-3132, 13-3212
*L.F.P.IP, LLC, et al. v. Hustler Cincinnati, Inc., et al.*

the non-moving party." *Id.* (citing *Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 298 (6th Cir. 2008)). As a defense to Larry's claims of trademark infringement, Jimmy did not claim that there is no likelihood of confusion between his use of the mark and Larry's use of it. Rather, he argued only that the brothers were, in fact, partners in the Hustler enterprise, ostensibly giving him the right to use the Hustler mark. In the alternative, he asserted that Larry's failure to control the mark estops him from enforcing the terms of Jimmy's implied license to use it.

### A.

The district court found, and we agree, that the brothers were not partners in the Hustler enterprise. In Ohio, a partnership agreement may be either express or implied. *See Madden Inv. Co. v. Stephenson's Apparel*, 832 N.E.2d 780, 782 (Ohio Ct. App. 2005). A partnership can be proven where there is "(1) an express or implied partnership contract between the parties; (2) the sharing of profits and losses; (3) mutuality of agency; (4) mutuality of control; and (5) co-ownership of the business and of the property used for partnership purposes or acquired with partnership funds." *Grendell v. Ohio EPA*, 764 N.E.2d 1067, 1077 (Ohio Ct. App. 2001) (quoting *Anchor v. O'Toole*, 94 F.3d 1014, 1024 (6th Cir. 1996)).

On appeal, Jimmy argues that the district court erred in determining that Jimmy and Larry did not form an express or implied partnership agreement related to the Hustler enterprises. However, his only argument is that the court "essentially ignored the first 8 years of Jimmy and Larry's business relationship, failed to address any of Jimmy's evidence, and failed to consider Jimmy's implied partnership claim." Jimmy claims that, as the "sole monetary investor in the first Hustler club in Cincinnati in November of 1969," and because "everything was in Jimmy's name"

Nos. 12-3132, 13-3212
*L.F.P.IP, LLC, et al. v. Hustler Cincinnati, Inc., et al.*

at the company's beginning, he was a partner in the enterprise. Jimmy concedes that there was never a written partnership agreement between the brothers.

Numerous witnesses testified to Larry's sole control over the Hustler enterprise. Allie Lee Jackson, III, Jimmy's accountant, testified that he never received a K-1 form from Jimmy, an income tax schedule which would have indicated Jimmy's partnership interest. Teddy Flynt, an executive vice president at L.F.P., Inc. as well as an attorney and cousin of the Flynt brothers, testified before the district court as the lead contact person for the L.F.P., Inc. audit and the coordinator of both the corporate tax returns and Larry's personal tax returns. Teddy testified that, based on the corporate financial records, Larry had made $96 million in capital contributions from his personal account to the trust companies. Jimmy had made none. Regarding distributions, Teddy testified that Larry had taken approximately $37 million in excess of his salary. Jimmy had taken none. Regarding loans, Teddy testified that Larry made approximately $20 million in loans to the trust companies. Jimmy had made none. Finally, Teddy testified that Larry had personally guaranteed loans in excess of $40 million for the trust companies. Jimmy guaranteed none. Jimmy's only asserted financial relationship to the company occurred at its inception, when Jimmy claims that he contributed $5000 to purchase the first Hustler club. However, these funds were repaid to Jimmy within a week. His minimal contribution is grossly insufficient to counter the substantial contributions and financial interdependence of Larry and the Hustler enterprise. *See In re Estate of Ivanchak*, 862 N.E.2d 151, 155–56 (Ohio Ct. App. 2006) (no partnership existed where there was no written partnership agreement, the firm did not file partnership tax returns, and the accountant did not treat the firm as a partnership).

Nos. 12-3132, 13-3212
*L.F.P.IP, LLC, et al. v. Hustler Cincinnati, Inc., et al.*

As further evidence that no partnership exists, Jimmy has testified in numerous proceedings over the course of Hustler's history that he does not have a partnership interest in the enterprise. In June 1978, Larry, Jimmy, and Larry's then-wife Althea were involved in a dispute over ownership of the Hustler enterprise. In settling this dispute, Jimmy executed a general release accepting ownership of Leasure Time Products, a mail-order company, and releasing all past, present, and future claims to ownership of the other companies.

In his petition seeking a conservatorship over Larry, Jimmy submitted a declaration from David Kahn, the general counsel of L.F.P., Inc., asserting that Larry was the sole owner and director of L.F.P., Inc. He also submitted a declaration from Marvin Miller, the chief operating officer and vice president of L.F.P., Inc., in which he called Larry the "sole shareholder of LFP [which is, in turn,] the sole shareholder of six separate corporations that comprise the Flynt publishing empire." Miller also noted that Larry was the chairman of the board of L.F.P., Inc. and the sole member of its board of directors.

In 2003, Jimmy gave deposition testimony during dissolution of marriage proceedings between himself and his wife. Jimmy testified that he worked as a "consultant" for his brother and that he "never see[s] any business records," "[doesn't] see any checkbooks," and "[doesn't] know what goes on business-wise, other than the idea of retail." Jimmy also testified that Larry fired him in 1984 and that Larry was the sole shareholder of LFP, Inc. He stated:

> Well, you have to understand, Hustler is Larry Flynt, you know. Everything that bears that name, he has complete control of, mind, soul, and body. So when I think of a club, when I think of a store, when I think of a magazine, I think it's him, 100 percent.

Nos. 12-3132, 13-3212
*L.F.P.IP, LLC, et al. v. Hustler Cincinnati, Inc., et al.*

Jimmy testified before the district court in this case, claiming that he and Larry were partners in the Hustler enterprise. However, these self-serving statements in the instant litigation, when viewed in light of his numerous sworn statements disclaiming any interest in the enterprise, simply fail to present a *genuine* issue of fact that would preclude a grant of summary judgment. In other words, Jimmy presented no evidence of a partnership contract, sharing of profits and losses, mutuality of agency and control, or co-ownership of the business or business property. In short, he presented nothing that could be deemed indicia of partnership. *See Sigmon v. Appalachian Coal Props., Inc.*, 400 F. App'x 43, 49 (6th Cir. Sept. 17, 2010) (holding that "conclusory allegations and bald conclusions of law . . . are insufficient to create a genuine issue of material fact as to the existence of an oral . . . agreement"); *see also Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) ("[U]nsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."); 10B Charles Alan Wright et al., *Federal Practice and Procedure* § 2738 (3d ed. 1998 & Supp. 2013) ("[U]ltimate or conclusory facts and conclusions of law, as well as statements made on belief or 'on information and belief,' cannot be utilized on a summary-judgment motion."); Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence . . . of a genuine dispute.") Because Jimmy failed to demonstrate the required elements of a partnership under Ohio law, and because his conclusory assertions of partnership do not create a genuine dispute, given the significant specific evidence to the contrary, the district court properly concluded that no partnership existed between the brothers.

Nos. 12-3132, 13-3212
L.F.P.IP, LLC, et al. v. Hustler Cincinnati, Inc., et al.

B.

In ruling on the trademark claims, the district court concluded that Larry and Jimmy had entered into an implied licensing arrangement by their conduct. In his cross-motion, Jimmy did not contest the existence of such a relationship, but argued only that the license was "naked"—that the licensor (Larry or L.F.P.) failed to control the mark and therefore is estopped from enforcing the terms of the license.

Jimmy argues that the district court improperly granted summary judgment to Larry because disputed issues of fact remain on the trademark claims. However, he does not develop this claim. Rather, he relies on the assertion that, despite Jimmy's payments to L.F.P., Inc. beginning in 2005, "those payments were not true licensing fees" and "no licensing agreement was ever in place." Because this issue is not fully developed and argued, we deem it waived. *Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005).

C.

Jimmy asserts that the district court erred in granting a permanent injunction against Jimmy's use of trademarks that is "overbroad" and "vague." He claims that the injunction improperly enjoined Jimmy and HCI from using the slogan, "Relax . . . it's just sex," which had not been part of any prior pleadings, and that the injunction was not limited in geographic scope or to specific goods, services, or activities. He claims that the injunction restricts use not only of Hustler marks, but "other" trademarks, which are not specifically identified. Finally, he alleges that the injunction improperly requires HCI to change its corporate name.

Nos. 12-3132, 13-3212
*L.F.P.IP, LLC, et al. v. Hustler Cincinnati, Inc., et al.*

This court reviews the scope of injunctive relief for an abuse of discretion. *Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 958 (6th Cir. 2004). "A plaintiff seeking a permanent injunction must demonstrate that it has suffered irreparable injury, there is no adequate remedy at law, 'that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted,' and that it is in the public's interest to issue the injunction." *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). The district court's injunction appropriately enjoined Jimmy's practice of willfully infringing Larry's trademarks and protected the public from confusion arising from his use of the marks. To the extent that Jimmy argues that the permanent injunction is overly broad and improperly includes the slogan, "Relax . . . it's just sex," his claim is without merit. Jimmy argues only that he coined the phrase and does not dispute that Larry is the registered owner of the "Relax . . . it's just sex" mark. Further, the injunction includes only those marks "owned" by Larry and the Hustler enterprise. Jimmy does not provide any legitimate basis for this court to vacate a permanent injunction that properly precludes Jimmy from willfully infringing Larry's trademarks.

### III.

Jimmy also claims that Larry wrongfully terminated him from Hustler, arguing that "there is sufficient evidence in the record for a jury to conclude that Jimmy could not be terminated without cause based on an express and/or implied employment agreement and/or the doctrine of promissory estoppel." He points to a declaration indicating that Larry told Jimmy "expressly and impliedly" between November 16, 1988 and early 2009, "that he would keep him on the company payroll, that

Nos. 12-3132, 13-3212
*L.F.P.IP, LLC, et al. v. Hustler Cincinnati, Inc., et al.*

he would have secure employment, and that he would otherwise be financially taken care of and that Jimmy was in the trust which was set up to hold legal title to the entire company." He continually asserts that he "was not an at will employee . . . and did not sign any documentation saying that he was," and that "Larry never once called Jimmy 'at-will'." However, this reverses the presumption of Ohio law that, absent an employment contract, an employee is an at-will employee. *Blackburn v. Am. Dental Ctrs.*, No. 10AP-958, 2011 WL 5825391, at *3 (Ohio Ct. App. Nov. 17, 2011) (citing *Mers v. Dispatch Printing Co.* 483 N.E.2d 150, 153 n. 1 (Ohio 1985)). Although an employment contract may be implied, the party asserting an implied contract must "prove the existence of all elements necessary for the formation of a contract." *Moore v. Kings Island Co.*, No. CA97-09-097, 1998 WL 230038, at *4 (Ohio Ct. App. Apr. 6, 1998).

Jimmy's assertions that Larry's promises of payment to him indicate some entitlement to employment are unavailing. In each case, Larry promised payment, not continued employment. Larry's purported statement to his parents that "as long as Jimmy works and does his job, I'll take care of him and I'll see that he has a job" is not to the contrary—Larry's promise to his parents of brotherly protection is not the equivalent of an entitlement by Jimmy to employment *at Hustler*. As noted by the district court in its opinion and order, there is no evidence that the brothers ever expressed "a *mutual* intent that Larry would employ Jimmy for life or that there was any meeting of the minds as to what the material terms of such an arrangement would be." Further, Ohio courts have addressed "indefinite" employment contracts and note that:

> Generally speaking, a contract for permanent employment, for life employment, or for other terms purporting permanent employment, where the employee furnishes no consideration additional to the services incident to the employment, amounts to an

> indefinite general hiring terminable at the will of either party, and a discharge without cause does not constitute a breach of such contract justifying recovery of damages.

*Henkel v. Educ. Research Council of Am.*, 344 N.E.2d 118, 121–22 (Ohio 1976) (quoting *Forrer v. Sears, Roebuck & Co.*, 153 N.W.2d 587, 589 (Wisc. 1967)).

In the alternative, Jimmy argues that he was terminated in violation of public policy because Larry fired him for being "unable to alter the outcome of litigation between Larry and Larry's nephews, and also because Jimmy was unwilling to comply with Larry's fraudulent request for a $400,000 loan." He also asserts that he was terminated in violation of Larry's fiduciary duty to him "at a time when he was a minority owner within the Hustler Enterprise."

So long as an employee serves at will, the employment relationship may be terminated by either party "for any or no reason, provided that the termination is not otherwise unlawful." *Curren v. City of Greenfield*, 978 N.E.2d 632, 638 (Ohio Ct. App. 2012) (internal quotation omitted). In other words, termination would only be precluded if the employee were discharged "in violation of a public policy clearly expressed in either the state or federal constitutions, state statutes, administrative rules and regulations, or the common law." *Id.* at 639 (internal quotation omitted). Jimmy has not asserted any source of Ohio law that would render his termination in violation of public policy. Regarding his argument that he was terminated in violation of Larry's fiduciary duty, he has failed to allege that he was, in fact, a minority shareholder in the enterprise at the time of his termination, so that any fiduciary duty would exist. Therefore, Jimmy has failed to demonstrate a genuine issue of material fact and the district court's grant of summary judgment was proper.

IV.

Jimmy also asserts claims under Ohio law for unjust enrichment and fraud. Unjust enrichment requires proof of "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Crawford v. Hawes*, --- N.E.2d ----, Nos. 25178, 25180, 2013 WL 3816664, at *8 (Ohio Ct. App. July 19, 2013). Fraud occurs where there is

> (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*McCauley v. LaYacona*, No. 12-COA-047, 2013 WL 3941098, at *3 (Ohio Ct. App. July 26, 2013). Jimmy alleges that he made asset transfers to Larry "based on his detrimental reliance of his brother's promises to him." However, as noted by the district court, "Jimmy has identified no specific instances in which Larry made material misstatements known by him to be false in order to mislead and harm Jimmy." He has also failed to specify an instance when Larry unjustly retained a benefit given by Jimmy. His generalized assertions about Larry's undue influence causing him to pay for the brothers' legal defense, to pay "excessive" rent, and to make other assorted wire transfers are insufficient to survive summary judgment.

V.

Jimmy also asserts a claim for breach of fiduciary duty. Under Ohio law, a breach of fiduciary duty arises if there is: "(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom." *Thomas v. Fletcher*, No. 17-05-31, 2006 WL 3702699, at *2 (Ohio Ct. App. Dec. 18, 2006) (internal quotation omitted). Jimmy claims that the district court improperly granted summary judgment on his breach of fiduciary duty claim because Jimmy "alleged facts spanning the course of 40+ years which demonstrate his unique sibling and business relationship with his brother." However, a fiduciary relationship does not emerge out of a simple familial connection. Further, as noted above, Jimmy has failed to demonstrate that he was a minority shareholder in the Hustler enterprise. Jimmy's ownership of HCI, a company not connected to the Hustler enterprise, does not indicate any ownership or business relationship with his brother in the companies in which he is involved. Therefore, summary judgment on this claim was proper.

VI.

Jimmy also argues that Larry breached a promise that he would include Jimmy as a fifty percent beneficiary of Larry's trust or will and that Larry has breached that agreement by removing Jimmy from his trust. The parties agree that California law governs this claim. In California, "a contract to make a will cannot be specifically enforced before the promisor's death." *In re Marriage of Drake*, 62 Cal. Rptr. 2d 466, 483 (Cal. Ct. App. 1997). Jimmy is correct to note that an exception applies "where the promisor has made an inter vivos transfer of property specifically covered by the contract." *Battuello v. Battuello*, 75 Cal. Rptr. 2d 548, 550 (Cal. Ct. App. 1998). Jimmy

acknowledges that no evidence exists in the record of such a transfer, but asserts that "within the last month there was a public media report that Larry has reached an agreement to sell the company headquarters in Beverly Hills, owned by the trust, for $82 million dollars." Because Jimmy concedes that such a transfer, if it occurred, is outside the scope of this record, the district court dismissed the claim without prejudice. We agree.

## VII.

For the foregoing reasons, we affirm the district court's judgment in all respects.